IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONWIDE PROPERTY & CASUALTY INS. CO., | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 16-01083-JMC |
| ERIC DORSEY, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff, Nationwide Property & Casualty Ins. Co. ("Nationwide"), filed a complaint against Defendants, Washrite, Inc. ("Washrite"), Mr. Kevin Gaines, and Mr. Eric Dorsey, seeking a declaratory judgment as to Nationwide's liability insurance coverage obligations following an on-the-job accident that occurred involving Mr. Dorsey and Mr. Gaines. (ECF No. 1). Since that filing, this Court entered an Order of Default Judgement in favor of Nationwide, against Washrite and Mr. Gaines. (ECF No. 12).[1] Thereafter, Defendants Washrite and Mr. Gaines were terminated from this litigation, leaving Nationwide and Mr. Dorsey as the remaining parties to this action. (ECF No. 12-13).

The remaining parties, Nationwide and Mr. Dorsey, have consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 23, 24). Now pending before the Court are their cross-motions for summary judgment. (ECF Nos. 15, 16). In deciding these motions, the Court has also considered both Mr. Dorsey's and Nationwide's Opposition/Reply, (ECF Nos. 17, 18), and a motions hearing was held on March 21, 2017. (ECF

---

[1] In so ordering, the Court found that Nationwide's coverage obligations to Mr. Gaines are limited to a maximum of $30,000 in connection with the lawsuit that had been filed in the Circuit Court for Prince George's County. (ECF No. 12).

Nos. 26, 27). For the reasons that follow, Plaintiff's motion for summary judgment is GRANTED, and Defendant's motion for summary judgment is DENIED.

**I.  Background**

This case involves an insurance coverage dispute arising from a motor vehicle incident involving Mr. Dorsey and Mr. Gaines, who were operating a truck that was owned by Washrite and insured by Nationwide. The cross-motions for summary judgment concern not only the underlying accident, but the relationship between the parties in this action and the insurance coverage obligations that are owed in light of those relationships.

**A.  The Parties**

Washrite is a "mobile vehicle washing company," located in Upper Marlboro, Maryland, that is owned and operated by Mrs. Julie Walters and her husband, Mr. Edward Walters.[2] (ECF Nos. 15-3, 16-4; J. WALTERS DEPO. at 7-8). Washrite sends out teams of workers, using Washrite-owned trucks equipped with "mounted washing equipment," to power wash commercial vehicles[3] at its customers' facilities. (ECF Nos. 15-4; E. WALTERS DEPO. at 9) (J. WALTERS DEPO. at 9-10).

Nationwide is an insurance carrier that issued a "Business Auto Coverage" Policy (the "Policy") to Washrite covering "bodily injury" and "property damages" to "employees" and "autos" of Washrite. (ECF No. 1-4) (ECF No. 15-9). The exact scope of this policy—to whom applies and the limits of liability—is the subject of the present dispute and is discussed in greater detail below.

---

[2] Though the Walters are the owners and operators of Washrite, Mrs. Walters specifically testified that she holds the position of "office manager," while her husband is "the president of the company." (ECF No. 15-1; J. WALTERS DEPO. at 7-8).

[3] Washrite also does "flat work" power washing, such as concrete, houses, and decks, but the majority of its work is power washing commercial vehicles. (E. WALTERS DEPO. at 8).

Mr. Dorsey and Mr. Gaines are both "workers" associated with Washrite. Both parties agree that, at the time of the accident in this case, Mr. Dorsey was an employee of Washrite. (J. WALTERS DEPO. at 23). Mr. Gaines's status, however, is disputed. As outlined below, Nationwide contends that Mr. Gaines was an employee of Washrite and not, as Mr. Dorsey contends, an independent contractor..

Though not parties to this action, Mrs. Casandra Gaines and Appearance Auto Detailing and Power Washing ("Appearance Auto") are both relevant to the present dispute. Mrs. Gaines is the sole owner of Appearance Auto, which, as the name implies, handles detailing and power washing of automobiles. (ECF Nos. 15-6, 16-6; C. GAINES DEPO. at 9). Her husband, Mr. Gaines, runs the day-to-day operations of that business. (C. GAINES DEPO. at 9-10). His precise involvement in those operations, discussed more thoroughly below, is relevant to the present dispute as the parties disagree whether, at the time of the accident, Mr. Gaines was acting as an employee of Washrite or Appearance Auto.

### B. The Accident

On July 30, 2012, Washrite sent Mr. Gaines and Mr. Dorsey to wash trucks and trailers at a Fed-Ex facility in Halethorpe, Maryland. (J. WALTERS DEPO. at 15-16, 41-42). Mr. Gaines was paired with Mr. Dorsey so that Gaines could "retrain" Dorsey in power washing and related procedures. (ECF Nos. 15-5, 16-5; K. GAINES DEPO. at 40-43). After washing the vehicles, Mr. Gaines told Mr. Dorsey that he was going to move their Washrite flat-bed truck. (K. GAINES DEPO. at 40-54). As Mr. Gaines began to do so, Mr. Dorsey fell off the rear of the truck and sustained injuries. (K. GAINES DEPO. at 64).

### C. Procedural Background

On February 27, 2015, Mr. Dorsey filed a complaint (the "Dorsey Complaint" or "Dorsey Action"), against Mr. Gaines in the Circuit Court for Prince George's County, Maryland, alleging that Mr. Gaines negligently caused him severe personal injuries. (ECF No. 15-7). That complaint was later amended on August 4, 2015, adding Mrs. Gaines and Appearance Auto as Defendants. That amended complaint, again, asserted that Mr. Gaines negligently caused severe personal injuries to Mr. Dorsey, but added that Mr. Gaines was acting within the scope of his employment for Mrs. Gaines and Appearance Auto, and thus they were vicariously liable for his negligent actions. On April 12, 2016, Nationwide filed the instant action in this Court, seeking a declaratory judgment "to resolve the dispute and end the uncertainties among the parties concerning their rights, duties, and obligations" as set forth under the Policy. (ECF No. 1).

### D. The Policy

The parties agree that the Policy was in effect at the time this accident occurred and provided coverage for Mr. Dorsey's injuries. (ECF No. 1-4). The parties disagree about the applicable limits of that coverage. The Policy contains the following terms that are relevant to the present dispute:

**SECTION V – DEFINITIONS**

\* \* \*

**E**. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

The Policy contains the following exclusion from liability:

**5. Fellow Employee**

\* \* \*

4

> "Bodily injury" to any fellow "employee" of the "insured" arising
> out of and in the course of the fellow "employee's" employment or while
> performing duties related to the conduct of your business.

Finally, the Policy is modified by a "Maryland Changes" form, (ECF No. 15-10), which provides in pertinent part:

> **A. Changes In Liability Coverage**
>
> 1. Except with respect to the Business Auto Physical Damage
> Coverage Form, the Fellow Employee Exclusion is replaced by the following:
>
>> This insurance does not apply to "bodily injury" to any fellow
>> "employee" of the "insured" arising out of and in the course of the
>> fellow "employee's" employment or while performing duties
>> related to the conduct of your business. However, this exclusion
>> does not apply for coverage up to the minimum limit specified by
>> the Maryland Vehicle Law.

## II.  Discussion

The principal issue in the cross-motions for summary judgment is the extent of Nationwide's liability under the Policy. Nationwide contends that Mr. Gaines was an employee of Washrite, that he and Mr. Dorsey were "Fellow Employees" as defined by the Policy, and thus, the "Maryland Changes" to the Fellow Employee exclusion in Policy create a sublimit "up to the minimum limit specified by the Maryland Vehicle Law," which, at the time of the accident on July 30, 2012, was $30,000. Mr. Dorsey, however, disagrees. He argues that Mr. Gaines was instead an independent contractor of Washrite, not an employee. As a result, the Maryland Changes to the Fellow Employee exclusion are not triggered, and the applicable limit of liability coverage in this matter is $1,000,000.

In sum, the parties agree that if Mr. Gaines was not an employee, then Nationwide's liability under the Policy is $1,000,000, whereas if he was an employee then Nationwide would

5

be subject to $30,000 in liability.[4] Therefore, the key consideration[5] in this matter is whether Mr. Gaines was an independent contractor or an employee of Washrite at the time the accident occurred.[6]

Typically, "[w]hen presented with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." Towne Management Corp. v. Hartford Accident and Indemnity Co., 627 F.Supp. 170 (D.Md.1985) (internal brackets omitted) (citing Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720). However, because here, the cross-motions are resolved by answering the same discrete issue—whether Mr. Gaines was an employee of Washrite at the time of the accident—the Court will address these motions concurrently.

Under Federal Rule of Civil Procedure 56, "the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Gbenoba v. Montgomery Cty. Dep't of Health & Human Servs., 209 F. Supp. 2d 572, 575 (D. Md. 2002) (internal citations and quotations omitted). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

---

[4] The parties agreed to this at the motions hearing.

[5] Though the parties disagree over the coverage obligations set forth under the Policy, that disagreement does not concern the interpretation of the Policy itself, but rather whether one of the terms of the Policy ("employee") applies to Mr. Gaines. Accordingly, the Court need not address the principles of contract interpretation.

[6] As both parties appear to agree, this insurance coverage dispute, which falls within this Court's diversity jurisdiction, is governed by the law of Maryland, where the action was filed and the insurance policy delivered. Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd., 843 F.3d 133, 136 (4th Cir. 2016).

"Thus, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." Id. (brackets omitted). "In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom in the light most favorable to the party opposing the motion but the opponent must bring forth evidence upon which a reasonable fact finder could rely." Id. "The mere existence of a *scintilla* of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment." Id. (emphasis in the original).

Under Maryland law, there are "five criteria in determining whether or not an employer/employee relationship exists between two parties. These criteria, developed from the common law standard for determining the master/servant relationship, include: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." Whitehead v. Safway Steel Prod., Inc., 497 A.2d 803, 808–09 (Md. 1985) (internal citations omitted).

In applying these "five factors," Maryland courts have said that "the factor of *control* stands out as the most important." Id. (emphasis added).[7] That is, "whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done is the decisive or controlling test." Id. (internal citations and quotations omitted). See also Auto. Trade Ass'n of Maryland v. Harold Folk Enterprises, Inc., 484 A.2d 612, 621 (Md. 1984) ("The decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct the employee in the

---

[7] Indeed, counsel for both parties have acknowledged that the factor if control is the decisive factor, and they devoted the majority of their arguments at the motions hearing to that issue.

performance of the work and in the manner in which the work is to be done"). But "[i]f the right to control is not present, and instead, the worker in question is to perform the work according to his own means and methods free from control of his employer in all details connected with the performance of the work except as to its product or result, then the worker is considered to be an independent contractor." Baker, Watts & Co. v. Miles & Stockbridge, 620 A.2d 356, 373 (Md. Ct. App. 1993) (internal citations omitted).

Maryland courts have recognized that the question of control is a fact-dependent inquiry that can be "demonstrated in a number of ways." Elms v. Renewal by Andersen, 96 A.3d 175, 183 (Md. 2014). By way of example, the Court of Appeals, in Whitehead v. Safway Steel Prod., Inc., 497 A.2d 803 (Md. 1985), found that there was sufficient control over a temporary worker such that an employer-employee relationship existed, even though that temporary worker was an employee of another company. In that case, Safway had contacted a "temporary help agency" to obtain temporary workers to perform work in its facility. Id. at 805. That agency assigned Whitehead to perform work for Safway, but the agency paid Whitehead a designated wage and maintained his workmen's compensation insurance to cover any unforeseen mishaps. Id. Despite this arrangement, the Court of Appeals found that there was an employment relationship between Safway and Whitehead because of the level of control that Safway had over Whitehead's work. Specifically, the Court noted that Safway instructed Whitehead on how to perform his tasks, Safway could assign him to other duties, Safway "supervised and directed his actions and rate of work," and, ultimately, Safway "was free to dismiss him and request an additional worker." Id.; see also Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd., 843 F.3d 133, 135 (4th Cir. 2016) (a recent decision in which the Fourth Circuit held that a nurse was an employee of a hospital she had been assigned to, rather than the staffing agency that had assigned her, despite

an express agreement designating her as an employee of the staffing agency and not the hospital. There, the Court, using Maryland's right-to-control test, arrived at this conclusion because of the level of control that the hospital exerted over her; noting, specifically, that the hospital assigned the nurse her duties, that the hospital supervised and oversaw her work, and that the hospital could reassign or dismiss the nurse.).

Before determining how the above principles apply, it is necessary to first review the undisputed facts which describe the relationship between Mr. Gaines and Washrite. Mr. Gaines was initially an employee of Washrite for a "period of time" during the 1990's. (J. WALTERS DEPO. at 12-13). In 2005, Washrite "asked him to come back" to work for the company. (J. WALTERS DEPO. at 23). Mrs. Walters testified at her deposition that, from 2005 until 2012, the year of the accident at issue, she believed Mr. Gaines was hired as a "subcontractor." (J. WALTERS DEPO. at 10-11). It is this second period of involvement with Washrite, from 2005 to 2012, that is the focus of these motions.

*1. Duties, Training, and Supervision*

As a part of his involvement with Washrite, Mr. Gaines was responsible for power washing customers' vehicles, training "new hires," and supervising Washrite employees that accompanied him on trips to customers' facilities. (K. GAINES DEPO. at 25). Mr. Gaines also solicited and obtained contracts new customers on behalf of Washrite. (J. WALTERS DEPO. at 11) (E. WALTERS DEPO. at 20-21). Those new contracts, however, were between Washrite and the new customer, not Mr. Gaines, and there was no guarantee that Mr. Gaines would even work on the contracts that he had a hand in obtaining. (J. WALTERS DEPO. at 28-29). For instance, Mr. Gaines did not obtain the Fed Ex contract that he and Mr. Dorsey were working on the day the accident occurred. (J. WALTERS DEPO. at 18, 38).

During his first stint with Washrite, when both sides agree he was an employee of Washrite, Mr. Gaines was trained as a power washer. (E. WALTERS DEPO. at 26-28). He was given the company's handbook, which sets forth certain work related practices, and he was familiarized with and trained to use the company's power washing equipment and materials. (E. WALTERS DEPO. at 26-28). During his second stint with Washrite, however, there is no indication of whether Mr. Gaines received any additional training as a power washer for Washrite.

Mr. Gaines did not select which jobs he would perform on behalf of Washrite. Instead, Washrite would prepare weekly schedules, and Mr. Gaines, like Washrite employees, would be given a "routing slip" notifying him what job he was assigned to that day and the location of that job. (K. GAINES DEPO. at 82) (J. WALTERS DEPO. at 25, 29). Accordingly, Mr. Gaines's work schedule varied according to the demands of Washrite customers and the needs of Washrite itself.

As a power washer for Washrite, Mr. Gaines was required to perform his duties "as required by the company." (K. GAINES DEPO. at 51). Mr. Gaines explained that he generally would follow a "very routine" washing process, whereby he would "soap, scrub, rinse and reevaluate" the jobs he was working on. (K. GAINES DEPO. at 51). Because of his level of experience, and his status as a foreman or supervisor, however, Mr. Gaines had discretion in how he power washed and how he instructed his fellow Washrite employees to work. (J. WALTERS DEPO. at 16-17).

According to Mrs. Walters, Mr. Gaines required less supervision than other Washrite employees, and he was someone that the Walters "trusted." (J. WALTERS DEPO. at 15). In fact, Mrs. Walters noted that, at the time the accident occurred, Mr. Gaines was not being supervised

by Washrite. However, Mr. Walters stated that Washrite exercised the same control of Mr. Gaines as it did with its regular employees. (E. WALTERS DEPO. at 13-14).

### 2. Vehicles, Equipment, and Uniforms

Mr. Gaines, like Washrite employees, was required to use Washrite trucks, power washing equipment and materials when he was working for Washrite, and indeed, he was using the company's vehicle, equipment, and materials on the day the accident occurred at the Fed-Ex facility. (J. WALTERS DEPO. at 28-30) (E. WALTERS DEPO. at 27) (K. GAINES DEPO. at 53). Similarly, Mr. Gaines, like employees of Washrite, was provided with a work uniform to wear while power washing on behalf of Washrite, and when he solicited sales for the company, he had the option of wearing the uniform or traditional "business attire." (J. WALTERS DEPO. at 29-30, 37) (K. GAINES DEPO. at 80-81). Mr. Gaines was also provided with "business cards" from the company, and Washrite purchased a 4-door sedan for Mr. Gaines, which was intended to be used when Mr. Gaines solicited sales for the company. (K. GAINES DEPO. at 34-35, 82).

### 3. Gaines' Relationship with Appearance Auto

Appearance Auto was a power washing and auto detailing company that was started in 2006 and wound down in 2013. (ECF No. 15-8). Mrs. Gaines was the sole owner of that company, but she did not have "any involvement" in it, as her husband, Mr. Gaines, "ran the business." (C. GAINES DEPO. at 9-10). Both parties agree that, while Mr. Gaines ran the operations of Appearance Auto, he was also performing the work described above on behalf of Washrite.

Mr. Gaines did not use any Washrite vehicles or equipment to perform work on behalf of Appearance Auto, nor did he perform any sales work for Appearance Auto while he was working for Washrite. (K. GAINES DEPO. at 20-21). Mr. Gaines testified at his deposition that, on the day

of the accident, he was working for Washrite. (K. GAINES DEPO. at 35). Moreover, at the time the accident occurred, Mr. Gaines did not have any contracts for power washing, other than those contracts affiliated with Washrite. (K. GAINES DEPO. at 40).

    *4. Compensation, Benefits, and Insurance*

Washrite compensated Mr. Gaines weekly for his services. (K. GAINES DEPO. at 29). For his power washing, training, and supervision of Washrite employees, Mr. Gaines was paid a "daily rate" of $125.00. (K. GAINES DEPO. at 28). For his sales efforts, Mr. Gaines was paid a percentage of the revenue for each contract he obtained. (K. GAINES DEPO. at 28-29). Washrite paid Mr. Gaines in the form of a check, though those checks were made out to Appearance Auto. (J. WALTERS DEPO. at 13). No taxes were withheld from Mr. Gaines's checks, and Washrite issued him a 1099 form, rather than a W-2 form at the end of the year. (K. GAINES DEPO. at 30) (J. WALTERS DEPO. at 12) Washrite did not provide Mr. Gaines with health insurance, workers' compensation, retirement benefits, or paid vacation. (K. GAINES DEPO. at 30-34).

Washrite required Mr. Gaines to have his own liability insurance policy through Nationwide, separate and apart from the policy at issue in this case. (J. WALTERS DEPO. at 36). Although Mr. Gaines was required to obtain that policy on his own, Mrs. Walters stated that Washrite would sometimes pay for that insurance policy, so as to ensure that it was kept current, and on occasion, those payments were deducted from Mr. Gaines's compensation from Washrite. (J. WALTERS DEPO. at 44-46.)

In light of these undisputed facts and the aforementioned legal principles governing the scope of an employer-employee relationship, the Court concludes, as a matter of law, that Mr. Gaines was an employee of Washrite at the time the accident occurred.

    *1. The power to select and hire the employee*

It is clear that Washrite had the ability to select Mr. Gaines. He was hired by the company as an employee during the 1990's. After leaving the company for a period of time, he was "asked to come back," in 2005, at which time he was assigned jobs by Washrite and was paid for the work he performed on behalf of the company. Accordingly, the Court finds that this factor weighs in favor of finding Mr. Gaines as an employee.

   *2. The payment of wages*

Mr. Gaines received a weekly compensation from Washrite depending on the type of work. For sales work, he obtained "a percentage" of the contract that he solicited, a commission-like method of payment that is traditionally befitting sales employees. And for his labor-oriented work—power washing, training, and supervision—Mr. Gaines was paid a daily wage of $125.00. As a result, the Court believes that this factor also supports a finding of employee status.

   *3. The power to discharge*

Mrs. Walters stated, and Mr. Walters and Mr. Gaines agreed, that Washrite had the ability to fire Mr. Gaines "at any time," if he was not performing to according to Washrite's standards. (J. WALTERS DEPO. at 26-27) (E. WALTERS DEPO. at 22-23) (K. GAINES DEPO. at 82). Therefore, just as the Maryland Court of Appeals found in Whitehead, the control and discretion that the employer had discharging Mr. Gaines is suggestive of an employer-employee relationship.

   *4. The power to control the employee's conduct*

The undisputed evidence shows that Washrite had significant control over Mr. Gaines in the course of his work for the company. As it did with other employees, Washrite put Mr. Gaines on a schedule on the date of the accident and instructed him where to go and which vehicles to power wash. Washrite paired Mr. Gaines with Mr. Dorsey, a fellow employee, so that Mr. Gaines

would train and supervise Mr. Dorsey. In fact, Mr. Gaines had no say or control over selecting the Washrite employees that he would work with. Moreover, Mr. Gaines was required to use Washrite's materials and equipment, to wear a Washrite uniform, and to drive Washrite vehicles.

In addition to his power washing and training and supervision, Mr. Gaines performed administrative-type work for the benefit of Washrite. He had to write work orders, record their time in and time out of the facility, document which trucks had been washed that day, and also handle power washing equipment. (K. GAINES DEPO. at 51.)

These restrictions over Mr. Gaines's conduct do not suggest that he could "perform the work according to his own means and methods free from control of his employer in all details connected with the performance of the work except as to its product or result," Baker, Watts & Co., 620 A.2d at 373, which would befit an independent contractor. Rather, such evidence was consistent with the deposition of Mr. Walters, the owner of Washrite, wherein he stated that the company exercised the same level of control over Mr. Gaines as it did its other employees. (E. WALTERS DEPO. at 13-14.)

Washrite generally required its employees to follow a step-by-step process in power washing customers' vehicles. Admittedly, as Mr. Dorsey points out, Mr. Gaines was not obligated to follow this established procedure, as he had some leeway in how he wanted to wash each vehicle to which he was assigned. Mr. Dorsey cites to a limited portion of Mrs. Walters's deposition that he believes shows that Mr. Gaines had unfettered discretion in exactly how he washed each vehicle. The full portion of Mrs. Walters's deposition testimony reads as follows:

Q. Was [Mr. Gaines] doing any sort of training of Mr. Dorsey?

>A. Well, he was there for about two months or so. I mean, [Mr. Gaines] could have showed him different ways if he's doing washing. You know, everybody is always different, so [Mr. Gaines] could have showed him different ways of washing. Everybody has their own different ways and standards and all that. He could have.
>
>Q. So there's no set –
>
>A. It wasn't set for training to go out for training, no.
>
>Q. And there's no set Washrite step-by-step formula to follow for power washing that Everybody has to follow?
>
>A. There is, but my foremen, if they have a certain way of doing, then they'll treat their helpers the way they like the trucks to be washed.

(J. WALTERS DEPO. at 16).

Mrs. Walters's deposition testimony is not as helpful as Mr. Dorsey would hope. The autonomy that Mr. Gaines had to perform the actual washing of the vehicles, according to his personal preference and experience, did not mean that Washrite did not retain the right to control him. Rather, this flexibility showed that Mr. Gaines was a trained and experienced power washer (in fact, originally trained by Washrite during a period of undisputed employment), with many years working for Washrite, and he was one that both Mr. and Mrs. Walters "trusted."

Moreover, there is no evidence that power washing was a highly technical procedure requiring strict adherence to a formal method or routine. Additionally, Plaintiff's position at oral argument was that no Washrite worker—no matter what their employment status—was required to follow a proscribed method of power washing. That is, Washrite did not "control" this routine aspect of the work for any of its workers. As a result, the method of power washing cannot appropriately be relied upon as a delineator of employer control. Rather, the indicia of control are that Mr. Gaines, like other employees, was told what vehicle to wash, what co-workers to

use, when and where to wash the vehicle, what his appearance should be on the job, what tools to use and what paperwork needed to accompany the finished job.

   5.   *Whether the work is part of the regular business of the employer*

Lastly, there is little doubt that the work performed by Mr. Gaines was "part of the regular business of" Washrite. Mr. Gaines was responsible for power washing, and training and supervising fellow employees, as well as bringing in new customers. This work was integral to Washrite's business and growth as a mobile vehicle washing company that utilizes teams of workers, with varying levels of experience, to wash commercial vehicles at its customers' facilities. Accordingly, this factor also shows that Mr. Gaines was working as an employee for the company.

In support of his motion for summary judgment, Mr. Dorsey cites several pieces of evidence that he believes show that Mr. Gaines was not an employee of Washrite, or, at the very least, show that there is a genuine dispute of material fact that precludes this Court from finding, as a matter of law, that Mr. Gaines was a Washrite employee.

Mr. Dorsey suggests that Mr. Gaines was an independent contractor, and not a Washrite employee, because he did not receive employee benefits, such as paid vacation, health insurance, retirement benefits, or workers' compensation insurance, and because Mr. Gaines was given a 1099 form and not a W-2 tax form.[8] The record does not contain evidence showing that other employees received such benefits or that they were taxed differently, although the parties suggested at oral argument that Mr. Gaines may have been treated differently from other workers in this regard. However, even if this is correct, Mr. Dorsey does not provide any authority for

---

[8] Farlow v. Wachovia Bank of N. Carolina, N.A., 259 F.3d 309, 314 (4th Cir. 2001) ("Form 1099 is used for reporting the income of non-employees, and the W–2 form is used for reporting the income of employees").

why the absence of such benefits outweighs other evidence in the record that clearly shows that Washrite had significant control over Mr. Gaines's work.[9]

Similarly, Mr. Dorsey notes that the wages owed to Mr. Gaines were paid to Appearance Auto, and not to Mr. Gaines directly. However, this situation is analogous to one thoroughly addressed by the Maryland Court of Appeals. In Whitehead, the Court of Appeals found that a temporary worker from an agency who had been provisionally assigned to work at Safway was nonetheless an employee of Safway, and not of the agency that had assigned him, even though payment for the worker's time was made to the agency and the agency was responsible for paying the employee's wages. 497 A.2d at 805.

Mr. Dorsey also notes that Mr. Gaines was required to maintain his own liability insurance as evidence that he was not an employee of Washrite. The Court is not persuaded by this evidence because such a requirement did not, in practice, differentiate Mr. Gaines from other Washrite employees because Washrite typically paid for that policy, only occasionally deducting that cost from Mr. Gaines's weekly pay check.

Mrs. Walters testified that she thought Mr. Gaines had been hired, for his second stint with the company, as a "subcontractor." This testimony, however, is not particularly helpful to Mr. Dorsey's case because, under Maryland law, such subjective beliefs are not relevant to the question of whether an employer-employee relationship exists, except to the extent that such a belief indicates a level of control over the employee. Whitehead, 497 A.2d at 812 ("The parties' subjective belief as to whether an employment relationship exists is not dispositive of the legal

---

[9] In a case where Maryland law was *not* applied, the Fourth Circuit has placed significant emphasis on employee benefits and tax forms. See e.g. Farlow, 259 F.3d at 315 ("The failure of an employer to extend employment benefits or to pay any payroll taxes is highly indicative that the employee is an independent contractor. A party's tax and benefit treatment can be virtual admissions of the party's status. In addition, the absence of regular, periodic payments is an indicia of independent contractor status") (internal citations omitted). This Court, however, is not aware of any Maryland caselaw that places that significant of emphasis on evidence relating to employee benefits and taxes compared to the element of control.

question of whether one is the employer of another, except as such belief indicates an assumption of control by the one and submission to control by the other."). And, here, Mrs. Walters offered that testimony merely as an opinion as to what she thought the status of Mr. Gaines's employment was, not to what extent she thought Washrite exerted control over Mr. Gaines.

Lastly, Mr. Dorsey argues that Mr. Gaines was an employee of Appearance and Auto, and, as a result, Appearance Auto "controlled" Mr. Gaines, not Washrite. Though both sides agree that, at the time of the accident, Mr. Gaines was an employee of Appearance Auto, Mr. Dorsey cites no authority suggesting that an individual cannot be an employee of two different employers. Cf. Whitehead, 497 A.2d at 809 ("A worker may simultaneously be the employee of two employers."). And the undisputed facts show that Mr. Gaines was acting as a Washrite employee when the accident occurred. He was sent, by Washrite, to perform work on one of Washrite's customers; a customer which Mr. Gaines had no hand in obtaining. In fact, Mr. Gaines noted that he had no contracts other than those affiliated with Washrite at the time the accident occurred. Mr. Gaines was using Washrite equipment, materials, and uniforms, and the accident occurred during the operation of a Washrite vehicle. Mr. Gaines was paired with, and instructed to train, a Washrite employee. In sum, nothing that Mr. Gaines was doing at the time of the accident suggests that he was acting independently from Washrite.

**III. Conclusion**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED. A separate order shall follow.

Dated: March 23, 2017                                     /s/
                                                        J. Mark Coulson
                                                        United States Magistrate Judge